HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MATTHEW WISECARVER, et al.,

        Plaintiffs,

    v.

KING COUNTY, et al.,

        Defendants.

CASE NO. C08-787RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on Plaintiffs' motion to certify a class.  Dkt. # 50.  The court has considered the parties' briefs and supporting evidence, and has heard from their counsel at oral argument.  For the reasons stated herein, the court DENIES Plaintiffs' motion without prejudice to their election to move for certification again in compliance with this order.

## II.  BACKGROUND

Plaintiffs are thirteen persons who were confined in the King County Correctional Facility ("KCCF" or "the jail") for at least one period of five or more days since May 2005.  Their periods of confinement collectively span most of the years 2005 through 2008.  Each of them was allegedly exposed to a range of unsanitary conditions during their confinement.  They seek to pursue not only their own claims for damages, but also

ORDER – 1

to represent a class of all persons who have been confined at KCCF for more than five days after May 2005 but before January 26, 2009.

KCCF is one of two institutions in King County for pretrial detention of persons accused of crimes and for incarceration of some persons convicted of crimes. Hyatt Decl. (Dkt. # 81) ¶ 6. There is little evidence in the record as to the ratio of pretrial detainees to convicted persons at the jail. For simplicity, the court will refer to all people confined at KCCF as "inmates." The KCCF inmate population is typically around 1200 people. Budge Decl. (Dkt. # 51), Ex. E (Hyatt Depo. at 23). The average period of confinement for any inmate is seventeen to eighteen days. *Id.* Although KCCF has special confinement areas for certain inmates, most are housed in "tanks." A tank houses as many as 20 inmates. *Id.* (Hyatt Depo. at 33-37). Tanks for male inmates have no private sleeping area, so inmates live, sleep, and eat in the tank's common areas. *Id.* (Hyatt Depo. at 35-36). Male inmates share a single sink, toilet, and shower with all others in the tank. *Id.* (Hyatt Depo. at 37). Each tank also has several urinals. *Id.* The record is less clear as to conditions for female inmates. It appears that women typically confined in units with double-bunked cells that open into a common living area with a single shower. The cells apparently have their own toilet and sink.[1]

A.    **Unsanitary Conditions in the Tanks**

Eleven of the thirteen named Plaintiffs have submitted declarations describing sanitary conditions in the tanks. The court now summarizes their evidence, along with evidence from KCCF officials. The court's summary is neither exhaustive of the

---

[1] The court's review of the underlying evidence is complicated by Plaintiffs' failure to cite specific evidence in their motion. Plaintiffs explain in their reply brief that they did so to save space. This practice is inappropriate, and the court seriously considered striking Plaintiffs' motion and requiring them to resubmit it with proper evidentiary citations. Parties presenting more complex and more evidence-intensive motions to this court routinely manage to cite relevant evidence and do so within applicable page limits. Plaintiffs have forced the court to hunt through the record in search of evidence. Where the court was unable to locate evidence, it considered whether Defendants had disagreed with Plaintiffs factual assertions. The court uses qualifying language like "it appears" or "apparently" to indicate factual assertions for which it found no evidence, but which Defendants did not dispute.

ORDER – 2

allegations of unsanitary conditions nor the evidence to support those allegations.  There are more allegations and evidence than the court need cite for purposes of this order.  The summary serves to demonstrate that Plaintiffs have at least presented colorable claims of unsanitary jail conditions and KCCF officials' knowledge of those conditions.

KCCF's inadequate cleaning of clothing underlies many of Plaintiffs' contentions. Until at least mid-2008, KCCF did not launder inmates' undergarments.  Inmates were issued a single pair of underwear and socks on arrival.  Budge Decl., Ex. E (Hyatt Depo. at 61).  Female inmates were also issued a bra.  *Id.* (Hyatt Depo. at 63).  Inmates could purchase additional underwear, but had no laundry facilities.  *Id.* (Hyatt Depo. at 65); Cabuco Decl. (Dkt. # 80) ¶ 7.  Inmates who could not afford to purchase underwear were issued new underwear once each month.  Cabuco Decl. ¶ 9.  With no laundry available, many inmates used sinks in the tanks to clean their underwear.  *E.g.*, Hoston Decl. (Dkt. # 62) ¶¶ 10, 15-16.  To do so, they used personal soap, which was also rationed to inmates who could not afford to purchase their own.  *E.g.*, Bollinger Decl. (Dkt. # 57) ¶ 15; Cabuco Decl. ¶ 8.  Indigent inmates received a weekly allotment of two one-ounce bars of soap.  Cabuco Decl. ¶ 8.  Inmates often hung their underwear in the tanks to dry them, creating ventilation and odor problems.  *E.g.*, Bollinger Decl. ¶ 16.  In addition, inmates were issued a single pair of slippers upon arriving at the jail, and the slippers were not washed for the duration of the inmate's confinement.  Budge Decl., Ex. E (Hyatt Depo. 107-08).

Inmates themselves were responsible for cleaning the tanks, including toilets, showers, sinks, floors, and mattresses.  Bliss Decl. (Dkt. # 79) ¶¶ 12-20.  KCCF provided spray bottles of cleaning solution and some cleaning tools, but only for limited periods. *E.g.*, Bacinski Decl. (Dkt. # 53) ¶ 11-15.  Except for those periods, cleaning products were not accessible.  *Id.*  Plaintiffs contend that the tanks were never clean as result of the limited availability and limited strength of the cleaning products.  *Id.* In particular, they claim that the sinks, showers and toilets were unacceptably filthy.  *E.g.*, Hoston Decl.

ORDER – 3

¶¶ 7, 9-10.  This was particularly problematic because the sinks were a source of drinking water for inmates.  *Id.* ¶ 10.

Inmates also complain about the sanitation of their mattresses.  Inmates were issued a plastic-coated mattress when they arrived at KCCF.  According to Plaintiffs, the mattresses were stained with dirt and body fluids.  *E.g.*, Mitchell Decl. (Dkt. # 68) ¶ 17.  Their plastic coatings were typically cracked, torn, or punctured.  *Id.*  Inmates attempted to clean the mattresses with the cleaning products described above, but they contend this was inadequate.  *Id.*  When inmates left the jail, KCCF reissued the mattresses to new inmates without cleaning them.  Budge Decl., Ex. F. (Scherer Depo. at 25-28).  KCCF apparently began introducing new mattresses sometime in 2006, although some of the older mattresses are still in use.  Hyatt Decl. ¶ 30.

Female inmates make an additional allegation: the jail did not provide adequate sanitary napkins during menstruation.  Several Plaintiffs describe having to use toilet paper or clothing as a poor substitute for appropriate hygiene products.  *E.g.*, Cobley Decl. (Dkt. # 59) ¶ 9.

The declarations from KCCF officials cited above suggest that Defendants had knowledge of the conditions about which Plaintiffs complain.  Further evidence for that proposition is contained in reports from the United States Department of Justice ("DOJ"), which commenced an investigation of conditions at KCCF in October 2006.  In November 2007, the DOJ submitted a report to KCCF detailing numerous adverse findings, among which were findings related to sanitary conditions and failure to prevent the spread of communicable diseases.  Budge Decl., Ex. A.  The DOJ ultimately filed suit against KCCF (the "DOJ litigation").  The DOJ litigation was coincidentally assigned to this court.  The court dismissed the DOJ litigation in February 2009 at the parties' request with the condition that King County comply with the terms of a Memorandum of Agreement requiring improved conditions at the jail.  Case No. C09-59RAJ, Dkt. # 7.

ORDER – 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      Named Plaintiffs Contracted MRSA**

In addition to their allegations about jail conditions, each Plaintiff contends that he or she contracted methicillin-resistant *Staphylococcus aureus* ("MRSA") infections during his or her confinement at KCCF. Each of them sought medical treatment either at KCCF or from other facilities after leaving KCCF. At present, there is no medical evidence in the record that demonstrates that conditions at KCCF are responsible for any Plaintiff's MRSA. Each Plaintiff's declaration, however, describes an infection ultimately diagnosed as MRSA that first manifested either during his or her confinement at KCCF or shortly after his or her release. *E.g.*, Allen Decl. (Dkt. # 52) ¶ 20. Although Plaintiffs allege that sanitary conditions at the jail are responsible for them acquiring MRSA, they do not specify which of the conditions described in the previous subsection are the cause.

For the most part, Defendants have presented no individualized evidence about Plaintiffs' MRSA infections. At least one Plaintiff had a prior history of MRSA. Kolde Decl. (Dkt. # 77), Ex. A (Bacinski Depo. at 87-88). Defendants contend that the KCCF inmate population is at high risk for acquiring MRSA outside of KCCF. They contend that Plaintiffs cannot prove that KCCF is responsible for them acquiring MRSA.

**C.      Plaintiffs' Relief and Classwide Relief**

Plaintiffs seek to represent not only themselves, but a class defined as follows:

> All former inmates of the KCCF who, since May 21, 2005 [but before January 26, 2009], were housed for five days or more in open housing units [(tanks)] and who seek only nominal and punitive damages for allegedly unconstitutional environmental conditions within such housing units.

Pltfs.' Mot. at 13; Reply at 5-6 (proposing Jan. 2009 termination of class period). Plaintiffs do not explain whether semi-shared housing units for female inmates are "open housing units" for purpose of this class definition, although it appears from their briefing that they intend to include female inmates in their class.

ORDER – 5

1    As the class definition suggests, Plaintiffs propose a novel structure for this

2    litigation.  For class members, they will seek only nominal damages and punitive

3    damages; for themselves, they will seek compensatory damages for acquiring MRSA and

4    perhaps other injuries as well.  Plaintiffs confirmed at oral argument that, in their view,

5    an election to be a part of their proposed class would amount to a waiver of any claim for

6    compensatory damages.

### III.   ANALYSIS

**A.    Substantive Standards Applicable to Plaintiffs' Claims**

9    Plaintiffs' proposal to eschew class members' compensatory damages in favor of

10   nominal and punitive damages is the cause of most of the concerns that dominate the

11   court's class certification analysis.  A discussion of the legal standards for Plaintiffs'

12   claims provides important context for that analysis.

13   In the operative complaint, Plaintiffs propose two legal theories.  First, they assert

14   that Defendants are liable under 42 U.S.C. § 1983 for violating their "rights under the

15   Eighth and/or Fourteenth Amendment to the United States Constitution."  2d Amend.

16   Compl. (Dkt. # 39) ¶ 20.  Second, they assert that "defendants are liable in negligence

17   under Washington law."  *Id.* ¶ 21.  The court assumes that Plaintiffs will not pursue state

18   law claims on behalf of the class.  Plaintiffs make no mention of Washington negligence

19   law in their certification motion.  Moreover, Washington law does not allow punitive

20   damages without legislative authorization, (*e.g.*, *Barr v. Interbay Citizens Bank*, 635 P.2d

21   441, 444 (Wash. 1981)), a prohibition that squares awkwardly with Plaintiffs' plan to

22   pursue only nominal and punitive damages on class members' behalf.

23   Focusing on Plaintiffs' constitutional claims, they assert violations of the Eighth

24   Amendment's prohibition on "cruel and unusual punishments."  It is now accepted that

25   the Eighth Amendment applies not only to formal punishments, but also to certain

26   conditions of confinement.  *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  To prove an

27   Eighth Amendment violation, a plaintiff must first prove that a condition of confinement

28   ORDER – 6

is objectively "sufficiently serious" that it denies "the minimal civilized measure of life's necessities." *Id.* at 298 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). The plaintiff must also prove, however, that one or more prison officials showed "deliberate indifference." *Id.* at 303. Deliberate indifference is "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Instead, a showing of deliberate indifference requires proof either that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," or alternatively that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and that the official "also dr[e]w that inference." *Id.* at 837.

Although Plaintiffs mention the Fourteenth Amendment, they offer little discussion of the standard it imposes. The Eighth Amendment applies solely to persons convicted of crimes; the Fourteenth Amendment's Due Process Guarantee governs claims relating to conditions of pretrial or presentence confinement. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (holding Fifth Amendment's Due Process Clause applicable to claims of pretrial detainees at federal detention center); *Pierce v. County of Orange*, 519 F.3d 985, 998 (9th Cir. 2009) (citing *Bell* and applying Fourteenth Amendment to claims of detainees in state custody). Plaintiffs contend that Eighth and Fourteenth Amendment standards of liability are no different, but Ninth Circuit authority varies on this issue. *See Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) ("Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment, however, we apply the same standards.") (citing *Redman v. County of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991)). Recent authority, however, suggests that Fourteenth Amendment standards are more favorable. *Pierce*, 519 F.3d at 998 (noting that Fourteenth Amendment standard "differs significantly from the standard relevant to convicted prisoners"); *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004) (noting that Fourteenth Amendment protections for pretrial detainees is "more protective" than Eighth

ORDER – 7

Amendment standard for convicts). A Fourteenth Amendment violation depends on proof of "conditions [that] amount to punishment of the detainee." *Bell*, 441 U.S. at 535. Whether a condition amounts to punishment turns on the nature of the condition and the legitimacy of prison officials' interest in imposing it. *Pierce*, 519 F.3d at 999.

Plaintiffs' quest for punitive damages requires additional proof. Nominal damages are mandatory upon proof of a wrong of constitutional dimension, even without any proof of compensatory damages. *George v. City of Long Beach*, 973 F.2d 706, 708 (9th Cir. 1992) ("In this Circuit, nominal damages must be awarded if a plaintiff proves a violation of his constitutional rights.").[2] Punitive damages, however, require a plaintiff to prove either that a defendant acted "with evil motive or intent," or acted with "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983) (affirming punitive damage award for prison official's Eighth Amendment violation).

With these substantive standards in mind, the court turns to its class certification analysis.

**B.      Class Certification Standards**

The court's decision to certify a class is discretionary. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009). Fed. R. Civ. P. 23 ("Rule 23") guides the court's exercise of discretion. A plaintiff "bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the [three alternative] requirements of Rule 23(b)." *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007). Rule 23(a) requires a plaintiff to demonstrate that the proposed class is sufficiently numerous, that it presents common issues of fact or law, that it will be led by one or more class representatives with claims typical of the class, and that the class representative will adequately represent the class. *Gen. Tel. Co. of the S.W. v. Falcon*,

---

[2] In light of *George* and numerous other cases mandating at least nominal damages for proof of the denial of a constitutional right, Defendants' suggestion that class members seeking only nominal damages lack Article III standing is specious. *See* Defs.' Opp'n at 21.

ORDER – 8

457 U.S. 147, 161 (1982); Fed. R. Civ. P. 23(a).  If a plaintiff satisfies the Rule 23(a) requirements, she must also show that the proposed class action meets one of the three requirements of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

In considering Rule 23's requirements, the court must engage in a "rigorous analysis," but a "rigorous analysis does not always result in a lengthy explanation or in-depth review of the record."  *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 (9th Cir. 2005) (citing *Falcon*, 457 U.S. 147, 161 (1982)).  The court is neither permitted nor required to conduct a "preliminary inquiry into the merits" of the plaintiff's claims.  *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)); *see also* Fed. R. Civ. P. 23 advisory committee's note (2003) ("[A]n evaluation of the probable outcome on the merits is not properly part of the certification decision").  As long as the court has "sufficient material before [it] to determine the nature of the allegations, and rule on compliance with [the] requirements [of Rule 23], and [it] bases [its] ruling on that material, [its] approach cannot be faulted because plaintiffs' proof may fail at trial."  *Blackie*, 524 F.2d at 901.  The court may assume the truth of a plaintiff's substantive allegations, *id*. at 901 n.17, but may require more than bare allegations to determine whether a plaintiff has satisfied the requirements of Rule 23.  *See*, *e.g.*, *Clark v. Watchie*, 513 F.2d 994, 1000 (9th Cir. 1975) ("If the trial judge has made findings as to the provisions of the Rule and their application to the case, his determination of class status should be considered within his discretion.").

The court now applies these standards to Plaintiffs' allegations and the evidence before the court.

## C.  The Proposed Class Likely Satisfies The Four Prerequisites of Rule 23(a).

In this section, the court will examine Plaintiffs' contention that their proposed class meets Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  Because the court's decision turns on its application of Rule 23(b), the

ORDER – 9

court will not necessarily reach ultimate conclusions as to the Rule 23(a) prerequisites. *See Zinser*, 253 F.3d at 1186 n.1 (affirming denial of class certification for failure to satisfy Rule 23(b) without reaching Rule 23(a) determinations).

### 1.      Numerosity

With an inmate population over the class period numbering in the thousands, if not the tens of thousands, numerosity would seem to be the easiest criterion for Plaintiffs to satisfy.  Plaintiffs complicate matters, however, by including not all KCCF inmates who were confined for at least five days during the class period, but rather all such inmates who "seek only nominal and punitive damages" for any injury arising out of their confinement.  This makes it more difficult to determine whether the proposed class "is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).

Plaintiffs have no idea how many potential class members are willing to "seek only nominal and punitive damages" for injuries arising out of their confinement. Assuming that Plaintiffs' declarations are accurate and representative of conditions throughout the class period, every class member would have a claim to compensatory damages.  *See Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) (noting that compensatory damages for a § 1983 claim include "economic harm, pain and suffering, and mental and emotional distress that results from the violations").  Plaintiffs obtained declarations from more than ten people who were confined at KCCF during the class period.  Each of these potential class members describes an infection that he or she allegedly contracted at KCCF that was diagnosed as MRSA.  *E.g.*, Kearney Decl. (Dkt. # 66) ¶ 9.  Each of them declares that they would "welcome the chance" to participate in this class action.  *E.g.*, Hunter Decl. (Dkt. # 63) ¶ 13.  None of them, however, declares that they understand that participating as a class member would require them to waive any claim for compensatory damages.  Indeed, the court's reading of the declarations (whose uniform language structure strongly suggests that they were all drafted by Plaintiffs' counsel) suggests that these potential class members believe that they will be

ORDER – 10

1   able to pursue damages for their own MRSA claims.  *E.g.*, Shoecraft Decl. (Dkt. # 74) ¶

2   13 ("I am interested in asserting my legal rights against the KCCF for subjecting me to

3   the conditions of confinement described above *and for the MRSA infection I acquired*.")

4   (emphasis added).  On this record, the court cannot say with certainty that any potential

5   class member would be willing to forgo his or her compensatory damage claims.

6          The size of the class has less to do with the number of inmates detained at KCCF

7   than with the number of inmates who will agree to participate in the class as Plaintiffs

8   have structured it.  Plaintiffs hope to certify a Rule 23(b)(3) class, and any such class

9   requires notice to potential class members and an opportunity to opt out of the class.  Fed.

10  R. Civ. P. 23(c)(2)(B).  Plaintiffs acknowledged at oral argument that many class

11  members will face a difficult choice between opting out of the class and attempting to

12  pursue their own litigation or another resolution of their claims, or remaining in the class

13  and abandoning a claim to anything other than nominal and punitive damages.  Given this

14  quandary, Plaintiffs have offered no prediction of the size of their class, and the court is

15  in no position to offer such a prediction.  *See Bauman v. United States Dist. Court*, 557

16  F.2d 650, 657 (9th Cir. 1977) (acknowledging that number of class members who may

17  opt out is relevant to numerosity inquiry).

18         The court need not decide today whether Plaintiffs have satisfied their burden to

19  prove that there are enough inmates willing to forgo compensatory damage claims to

20  constitute a class.  The court will, however, revisit the questions of procedural and

21  substantive fairness that arise from Plaintiffs' insistence that class members (other than

22  themselves) abandon compensatory damage claims.

23         Before leaving the numerosity inquiry, the court notes that the differences between

24  the Eighth Amendment claims of convicted inmates and the Fourteenth Amendment

25  claims of pretrial detainees may necessitate the formation of subclasses.  The record does

26  not specify which Plaintiffs were detainees and which were convicted of crimes.

27  Plaintiffs must address these issues in future submissions to the court.

28  ORDER – 11

1

2. **Commonality**

2      There is little question that the class claims present numerous common questions

3  of law and fact.  The evidence before the court reflects that the sanitary conditions at

4  KCCF were the result of KCCF policies, not isolated incidents of uncleanliness.

5  Unraveling the evolution of those policies and their effect on conditions in the tanks will

6  require the resolution of numerous common factual questions.  Once the conditions,

7  KCCF officials' knowledge of those conditions, and their responses are established, the

8  determination of whether KCCF violated the Constitution presents a common legal

9  question.

10      Rule 23(a)(2) merely requires Plaintiffs to show that "there are questions of law or

11  fact common to the class."  Although the Rule speaks of "questions" in the plural, courts

12  have held that a single common issue is sufficient to meet the commonality requirement.

13  *E.g.*, *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996); *see also Hanlon v.*

14  *Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("The existence of shared legal

15  issues with divergent factual predicates is sufficient, as is a common core of salient facts

16  coupled with disparate legal remedies.").  By contrast, Rule 23(b)(3) requires class

17  plaintiffs to show that common questions predominate over individualized questions.  *See*

18  *Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less

19  rigorous than the companion requirements of Rule 23(b)(3).").  The court finds that

20  Plaintiffs satisfy Rule 23(a)(2)'s minimal commonality standard.  The court reserves a

21  discussion of the issues that are not common to all class members for its later analysis.

22

3. **Adequacy and Typicality**

23      Unlike the numerosity and commonality criteria, the criteria of adequacy of

24  representation and typicality focus on the class representatives.  *See Hassine v. Jeffes*,

25  846 F.2d 169, 176 (3d Cir. 1988) ("'[C]ommonality' like 'numerosity' evaluates the

26  sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates

27  the sufficiency of the named plaintiff[s]").  Rule 23(a)(3) requires that the "claims or

28  ORDER – 12

defenses of the representative parties are typical of the claims or defenses of the class."
This standard is permissive: claims or defenses are typical "if they are reasonably co-
extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

Rule 23(a)(4) requires Plaintiffs to show that "the representative parties will fairly
and adequately protect the interests of the class."[3]  In determining whether the Plaintiffs
are adequate class representatives, the court must consider if they have "any conflicts of
interest with other class members" and whether they will "prosecute the action vigorously
on behalf of the class." *Hanlon*, 150 F.3d at 1020.

In at least one sense, Plaintiffs are typical of the class members they hope to
represent.  Like class members, Plaintiffs were subjected to allegedly unconstitutional jail
conditions for at least five days during the class period.  Moreover, because Plaintiffs'
periods of confinement at KCCF collectively span the vast majority of the class period,
some subset of the named Plaintiffs likely has experiences typical of any class member
confined during any portion of the class period.  The court notes, however, that Plaintiffs
do not dispute that KCCF implemented several changes to its sanitation policies over the
class period, particularly in its final months.  *E.g.* Budge Decl., Ex. E (Hyatt Depo. at 57)
(describing changes to underwear policy in 2008).  The court is concerned that Plaintiffs
have made no showing that they have personal knowledge of the effect of those changes
upon conditions at the jail.  In future submissions, Plaintiffs must address that concern by
clarifying the record, adding one or more class representatives, or cutting off the class
period at an earlier date.

In another sense, however, Plaintiffs are atypical of the class members they hope
to represent, in no small part because Plaintiffs would not qualify as class members.  *See*
*Falcon*, 457 U.S. at 156 ("We have repeatedly held that a class representative must be
part of the class") (internal quotation omitted).  Unlike the class, Plaintiffs are pursuing

---

[3] Plaintiff Matthew Wisecarver died in April 2009.  Kolde Decl. ¶16.  Plaintiffs have not
addressed what impact this development has on his status as a class representative.

ORDER – 13

1    claims for compensatory damages arising from their confinement at the jail.  They ask

2    class members to abandon the same claims as a condition of being part of the class.  For

3    purposes of this order, the court need not decide whether this fact, in conjunction with the

4    typicality concerns raised above, means that Plaintiffs do not satisfy Rule 23(a)(3)'s

5    typicality requirement.  If Plaintiffs elect to continue their pursuit of class certification,

6    they must address these concerns.

7            In addition to the typicality concerns the court just noted, Plaintiffs' proposal to

8    require class members to sacrifice their compensatory damage claims while pursuing

9    their own raises serious questions about conflicts of interest.  There is no per se conflict,

10   as Plaintiffs would share class members' interests in proving constitutional violations and

11   maximizing punitive damage claims.  Plaintiffs' need to prove their own compensatory

12   damage claims, however, raises numerous potential conflicts.  First, Defendants could

13   use the two sets of claims to exert settlement leverage on either Plaintiffs or the class.  A

14   settlement offer that either favors the class claims or the individual claims would be one

15   that Plaintiffs could neither accept nor reject without obvious conflicts of interest.

16           The difficulty of proving Plaintiffs' MRSA-related claims also raises potential

17   conflicts.  In Part III.A, *supra*, the court explained that Plaintiffs' constitutional claims

18   require them to prove Defendants' deliberate indifference to a known or apparent risk to

19   inmate health or safety, and that their claim for punitive damages requires additional

20   proof of Defendants' awareness of health risks.  Plaintiffs can attempt to prove

21   Defendants' knowledge without presenting evidence of their MRSA injuries, but there

22   seems little question that proof that some inmates were acquiring serious infections as a

23   result of KCCF's policies would strengthen the case for deliberate indifference.  Based on

24   the record before the court, it appears that Plaintiffs would do so by demonstrating that

25   they contracted MRSA.  If so, Defendants have a well-founded objection that, at best, a

26   small portion of the KCCF population acquired MRSA.  In that case, Plaintiffs' injuries

27   are not typical of the injuries of other class members.  At oral argument, Plaintiffs

28   ORDER – 14

proposed for the first time that trial be bifurcated, with a first phase devoted to proof of the classwide claims, and a second phase devoted to proving their individual MRSA claims.  Although the court will revisit that proposal in its Rule 23(b)(3) analysis, it suffices for now to observe that by withholding evidence about MRSA until phase two, Plaintiffs would seem to deal a serious blow to the class's chance of obtaining punitive damages, or at least to the size of a punitive damage award.

        The court need not decide whether these concerns make Plaintiffs inadequate or atypical class members.[4]  For purposes of this order, it suffices to note that the dichotomy between the class claims and Plaintiffs' individual claims, in addition to Plaintiffs' decision to define the class to exclude themselves, raises difficult and unanswered questions about Plaintiffs' typicality and their adequacy as class representatives.

**D.      On the Record Before the Court, Plaintiffs Have Not Satisfied Rule 23(b)(3).**

        Plaintiffs' rely solely on Rule 23(b)(3) to certify their proposed class.  To certify a Rule 23(b)(3) class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The "predominance" and "superiority" prongs of Rule 23 work together to ensure that certifying a class "would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (internal citation and quotation omitted).  A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'"

---

[4] The court finds no merit in Defendants' contention that Plaintiffs are inadequate class representatives because they lack sufficient knowledge about the details of this litigation.  Class members will appropriately rely on their counsel (whose qualifications have not been challenged) to navigate this litigation.  By appearing for deposition and providing declarations, Plaintiffs have demonstrated personal knowledge of the facts underlying this litigation, and a willingness to help prove those facts.  Rule 23(a)(4) requires no more of Plaintiffs.

ORDER – 15

1   *Vinole*, at 944 (quoting *Zinser*, 253 F.3d at 1189).  Rule 23(b)(3) provides a non-

2   exclusive set of factors to guide the court's predominance and superiority inquiries:

> (A) the class members' interests in individually controlling the prosecution
> or defense of separate actions; (B) the extent and nature of any litigation
> concerning the controversy already begun by or against class members; (C)
> the desirability or undesirability of concentrating the litigation of the claims
> in the particular forum; and (D) the likely difficulties in managing a class
> action.

7   The court must determine whether resolution of common questions would resolve a

8   "significant aspect" of the class members' claims such that there is "clear justification"

9   for class treatment.  *Hanlon*, 150 F.3d at 1022 (citations omitted).

10          The court acknowledges the potential benefits of class certification.  Although the

11  DOJ litigation mandates improved conditions at KCCF, it provides nothing for persons

12  harmed in the past by those conditions.  Neither Plaintiffs nor Defendants point to any

13  pending litigation that seeks redress for persons exposed to these conditions.  Many, if

14  not most, of the members of the proposed class likely face economic challenges and other

15  obstacles that make individual litigation over KCCF conditions an unlikely prospect.  A

16  class certified in a Seattle court is likely to be a much better vehicle than individual

17  litigation for providing relief.

18          To say that a class action could serve class members well, however, is not to say

19  that *this* class action will necessarily serve class members well.  At the threshold,

20  Plaintiffs have provided only the most skeletal outline of their plan for notifying class

21  members of this suit.  Plaintiffs concede that this class will likely be unusually difficult to

22  notify by mail, as the only address available for each class member will be whatever

23  address that he or she provided to KCCF.  Plaintiffs and Defendants agree that it is likely

24  that those addresses will be invalid for many putative class members.  Plaintiffs can of

25  course pursue alternative forms of notice, including notice by publication, but they do not

26  address how effective such notice is likely to be.  *See* Fed. R. Civ. P. 23(c)(2)(B)

27  (requiring court to "direct to class members the best notice that is practicable under the

28  ORDER – 16

circumstances, including individual notice to all members who can be identified through reasonable effort"). The likely difficulties in notifying class members have two important consequences. First, without notice, class members may automatically become part of the class, thus giving up their right to pursue compensatory damages without an opportunity to consider their alternatives.[5] Second, those class members who do not receive notice will also have no realistic opportunity to share in any proceeds of successful litigation. In essence, Plaintiffs propose that an unascertainably large portion of the class unknowingly accept the disadvantages of this litigation (abandoning compensatory damage claims) in exchange for no share in any potential recovery. Plaintiffs do not explain why a class action is superior to individualized actions in light of these concerns.

In addition, the court finds that individual issues predominate over classwide issues, at least as Plaintiffs currently propose to litigate this case. Defendants assert that proving Plaintiffs' individual MRSA-related claims will be a complex and evidence-intensive task. Not only must Plaintiffs prove that they were diagnosed with MRSA, they must prove that conditions at the jail caused them to acquire MRSA or permitted MRSA to thrive in their bodies. Defendants in turn will attempt to demonstrate that each Plaintiff acquired MRSA outside the jail, or that each Plaintiff's out-of-custody conduct or exposures are to blame for his or her infection. The evidence necessary to prove and defend against these claims will no doubt come from numerous medical and non-medical witnesses, and will likely require expert testimony. Because the evidence for each Plaintiff will be different, the evidentiary burdens will be multiplied thirteenfold. In this court's view, proof of the conditions at the jail from 2005 to 2009, itself a complex task, is nonetheless simpler than proving Plaintiffs' thirteen individual MRSA-related claims.

---

[5] It is also possible that a potential class member who either never receives notice or receives notice but does not opt out will nonetheless not be part of the class because he or she has does not "seek *only* nominal and punitive damages," as the class definition requires. Plaintiffs' insertion of this clause in the class definition raises many concerns that they do not address.

ORDER – 17

1    Plaintiffs give short shrift to these concerns.  Their briefing barely addresses them,

2    and indeed barely addresses case management at all.  Rule 23(b)(3)(D) directs the court

3    to consider "likely difficulties in managing a class action."  Those difficulties are

4    magnified when Plaintiffs propose no plan for surmounting them.  As the court observed

5    in Part III.C.3, *supra*, Plaintiffs proposed for the first time at oral argument that the court

6    bifurcate this case into two trial phases, with a first phase dedicated to classwide claims

7    for nominal and punitive damages, and a second phase dedicated to Plaintiffs' individual

8    MRSA-related claims for compensatory damages.  This proposal raises grave concerns.

9    Absent proof of actual consequences to health or safety in phase one, Plaintiffs would

10   seem to be poorly situated to prove either Eighth or Fourteenth Amendment violations or

11   to make a compelling case for punitive damages.  Plaintiffs would have absent class

12   members forgo their right to present evidence of their own injuries so that their right to

13   nominal and punitive damages can be vindicated by class representatives who will

14   withhold proof of their most serious injuries until after the jury determines liability and

15   punitive damages.  The court does not suggest that Plaintiffs cannot prevail on classwide

16   claims without presenting evidence of their individual injuries, merely that their case

17   seems much weaker without that evidence.  Again, Plaintiffs do not explain how their

18   approach is superior to individual adjudication in light of these concerns.

19   None of the concerns that the court has highlighted above are necessarily fatal to

20   Plaintiffs' effort to certify a class.  If Plaintiffs still wish to pursue classwide relief, they

21   may do so, but only after addressing the concerns that the court has raised in this order.

22   Plaintiffs devoted insufficient attention to explaining in detail how they will manage this

23   litigation to ensure that both the individual claims and class claims can be adjudicated

24   efficiently.  If they choose to file a second motion to certify a class, the court expects that

25   they will provide a detailed litigation management plan, and will address other issues that

26   the court identified in this order.  In particular, Plaintiffs must address how whether they

27   will redefine the class, how they will provide effective notice to class members, and how

28   ORDER – 18

1    they will structure litigation such that their individual MRSA-related claims do not

2    dominate the litigation.

### IV.  CONCLUSION

4          For the reasons stated above, the court DENIES Plaintiffs' motion to certify a

5    class (Dkt. # 50), but does so without prejudice to a second motion for class certification

6    that addresses the concerns the court raised in this order.  If Plaintiffs elect this option,

7    they need not repeat the allegations and argument from this motion.  The court expects a

8    second motion to focus on the issues raised in this order.

9          Alternatively, the Plaintiffs may elect to abandon their effort to certify a class and

10   focus on individual claims.  Plaintiffs must inform Defendants and the court of their

11   election no later than November 13, 2009.  They must then meet and confer with

12   Defendants to either propose a new schedule for class certification briefing, or to propose

13   a schedule for bringing their individual claims to trial.  No later than November 30, 2009,

14   the parties must submit a joint statement with either their agreed proposed litigation

15   schedule or, if they are unable to agree, a statement of their preferred schedules.

16         In light of this order, the court VACATES all pending deadlines from its October

17   30, 2008 order setting the trial date and related case management deadlines.

18         DATED this 30th day of October, 2009.

*Richard A Jones*
_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 19